UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

DALLAS E. H.,

          Plaintiff,

  v.

KILOLO KIJAKAZI,
Acting Commissioner of Social Security,

          Defendant.

Case No. 20 C 2717

Magistrate Judge Sunil R. Harjani

## MEMORANDUM OPINION AND ORDER

Dallas E. H. appeals from the denial of his application for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act. For the following reasons, Dallas's request for reversal or remand [17] is denied, the Acting Commissioner's motion [22] is granted, and the ALJ's decision is affirmed.

## BACKGROUND[1]

Dallas, who was born in 1971, applied for SSI on October 3, 2016, alleging disability due to bipolar disorder since May 1, 2016. Dallas has a history of bipolar disorder with psychotic features, major depression, anxiety, and two psychiatric hospitalizations in May and July 2016. Dallas has taken psychotropic medications and received individual therapy to treat his mental impairments but stopped all treatment in the fall of 2017. Dallas completed high school and has a bachelor's degree in communications from DePaul University. Dallas last worked in 2004 and has no past relevant work experience.

---

[1]      Because Dallas challenges only the ALJ's assessment of his mental impairments, the Court limits its factual summary and subsequent discussion to the evidence related to his mental condition.

On March 7, 2019, the ALJ issued a decision denying Dallas's application. (R. 84-97). The ALJ found that Dallas's affective disorder (bipolar and depression) and general anxiety disorder were severe impairments, but they do not meet or medically equal the severity of any of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. *Id*. at 86-89. The ALJ determined that Dallas retained the residual functional capacity ("RFC") to perform a full range of light work with certain non-exertional limitations. *Id*. at 89-95. The ALJ found that Dallas is limited to simple, routine, and repetitive tasks, in a work environment free of fast-paced production requirements, involving only simple, work-related decisions with few, if any, workplace changes, and is limited to only occasional interactions with supervisors, coworkers, and the general public. *Id*. Based on the vocational expert's ("VE") testimony, the ALJ found that Dallas is able to perform unskilled jobs that exist in significant numbers in the national economy, namely hand packer, assembler, and sorter. *Id*. at 96. As a result, the ALJ found that Dallas was not disabled since October 3, 2016, the date of his application. *Id*. at 97.

## DISCUSSION

Under the Social Security Act, disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). To determine whether a claimant is disabled, the ALJ conducts a five-step inquiry: (1) whether the claimant is currently unemployed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals any of the listings found in the regulations, *see* 20 C.F.R. § 404, Subpt. P, App. 1 (2004); (4) whether the claimant is unable to perform his former occupation; and (5) whether the claimant is unable to perform any other available work in light of his age, education,

and work experience. 20 C.F.R. § 416.920(a)(4); *Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000). These steps are to be performed sequentially. 20 C.F.R. § 416.920(a)(4). "An affirmative answer leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled. A negative answer at any point, other than Step 3, ends the inquiry and leads to a determination that a claimant is not disabled." *Clifford*, 227 F.3d at 868 (quoting *Zalewski v. Heckler*, 760 F.2d 160, 162 n.2 (7th Cir. 1985)).

Judicial review of the ALJ's decision is limited to determining whether the ALJ's findings are supported by substantial evidence or based upon a legal error. *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002). Substantial evidence "means—and means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Biestek v. Berryhill*, 139 S.Ct. 1148, 1154 (2019) (quoting *Consol. Edison Co. v. NLRB*, 305 US 197, 229 (1938)). "Although this standard is generous, it is not entirely uncritical." *Steele*, 290 F.3d at 940. Where the Commissioner's decision "lacks evidentiary support or is so poorly articulated as to prevent meaningful review, the case must be remanded." *Id.*

In support of his request for reversal or remand, Dallas argues that the ALJ erred in: (1) failing to adequately accommodate his non-exertional limitations in his RFC; (2) discounting his statements about the limiting effects of his mental impairments; and (3) weighing certain mental health opinion evidence. For the reasons discussed below, the Court finds the ALJ's decision supported by substantial evidence—which is only "more than a mere scintilla." *Biestek*, 139 S.Ct. at 1154.

## A.    The ALJ's Mental RFC Determination

Dallas argues that the ALJ failed to properly consider his non-exertional functional limitations, and there is no basis for finding that he could sustain the on-task, attendance, and social requirements of full-time work. In particular, Dallas complains that the ALJ's RFC limitations

3

did not adequately address his moderate limitations in concentration, persistence and pace ("CPP").  According to Dallas, the Seventh Circuit "has long held that limiting an individual, in an RFC assessment and hypothetical to the VE to simple, repetitive—i.e. unskilled—work does not necessarily address moderate deficiencies of concentration, persistence and pace." Doc. 17 at 10.

"The RFC is an assessment of what work-related activities the claimant can perform despite [his] limitations." *Young v. Barnhart*, 362 F.3d 995, 1000 (7th Cir. 2004).  The RFC assessment "must incorporate a claimant's limitations, including moderate CPP limitations." *Bruno v. Saul*, 817 F. App'x 238, 242 (7th Cir. 2020).  A "restriction to simple tasks is 'generally' not enough to account for moderate CPP limitations." *Id.*; *Crump v. Saul*, 932 F.3d 567, 570 (7th Cir. 2019).  But "[t]here is no categorical rule that an ALJ may never accommodate 'moderate' limitations in concentration, persistence, and pace with only a restriction to simple tasks." *Weber v. Kijakazi*, ---- Fed. Appx. ----, 2021 WL 3671235, at *5.  As relevant here, the Seventh Circuit has held that "an ALJ may reasonably rely upon the opinion of a medical expert who translates [CCP] findings into an RFC determination." *Burmester v. Berryhill*, 920 F.3d 507, 511 (7th Cir. 2019); *see also Milliken v. Astrue*, 397 F. App'x 218, 221 (7th Cir. 2010).

The Court finds no error in this case because the ALJ's RFC is directly supported by the medical opinion of the testifying medical expert, Dr. Mark Oberlander, Ph.D.  After review of the medical record and observation of Dallas's testimony, Dr. Oberlander acknowledged Dallas's moderate CPP limitations but also concluded that the record did not support the severity of Dallas's self-reported symptoms.  Dr. Oberlander opined at the hearing that based on Dallas's mental impairments, including his moderate limitation in maintaining CCP, he could perform: (1) simple, routine, repetitive work activities; (2) low stress work, defined as a work setting in which there are

no strict hourly production rates but could meet end of day production expectations; with (3) the adaptive functionality to understand how to get to the workplace and react reasonably to changes in work assignments; and (4) occasional contact with others, coworkers, supervisors, and the public. (R. 40-41). Dr. Oberlander testified that he saw "no other limitations . . . in the record." *Id*. at 41. The ALJ's RFC determination mirrors the functional limitation findings of Dr. Oberlander, restricting Dallas to: (1) simple, routine, repetitive tasks; (2) a work environment free of fast-paced production requirements; (3) simple, work-related decisions with few, if any, workplace changes; and (4) occasional interactions with supervisors, coworkers, and the general public. *Id*. at 89.

The ALJ reasonably relied on Dr. Oberlander's opinion to craft an RFC that addressed Dallas's moderate limitations in CPP and other non-exertional limitations, and his opinion provides substantial evidence that Dallas can perform the work described in the ALJ's RFC determination even with his moderate CPP limitations. *Lockett v. Saul*, 834 F. App'x 236, 239 (7th Cir. 2020) ("The ALJ was entitled to rely on [the testifying medical expert's] opinion" that the claimant could work in a "simple, repetitive, routine work environment with only occasional interaction with the public."); *Urbanek v. Saul*, 796 F. App'x 910, 914 (7th Cir. 2019) (ALJ "appropriately relied on [medical expert psychologist's] testimony to formulate [claimant's] residual functional capacity."). In his reply, Dallas acknowledges that "an ALJ may certainly choose to rely upon the opinion of the testifying medical expert," but he contends that such reliance was unsupported in this case. Doc. 24 at 2. As discussed further below, Dallas's argument in this regard is unavailing because the ALJ appropriately considered Dr. Oberlander's opinion and determined that it was entitled to significant weight.

Moreover, the Seventh Circuit has held that a medical expert's ("ME") opinion supported by the opinions of the state agency consultants is an "adequate evidentiary foundation" for the RFC assessment. *Urbanek*, 796 F. App'x at 914; *Matthews v. Saul*, 833 F. App'x 432, 436 (7th Cir. 2020) (no error where the "assigned RFC is consistent with, and encompasses the limitations set forth in the state agency consultants' and testifying medical expert's opinions."); *White v. Barnhart*, 415 F.3d 654, 659 (7th Cir. 2005) ("The ALJ's ultimate residual functional capacity finding tracked [the testifying medical expert's] opinion almost exactly, and [his] opinion, buttressed by the State Consultants' opinions, was an adequate evidentiary foundation for the [RFC] finding."). Here, the state agency consultants opined that Dallas could meet the basic demands of competitive, remunerative, 1-2 step tasks on a sustained basis, in settings of low social contact, including the abilities to understand, carry out, and remember simple instructions; make judgments commensurate with the function of simple work, *i.e.* simple work-related decisions; respond appropriately to supervision, coworkers, and work situations; and deal with changes in a routine work setting. (R. 61, 76). The ALJ gave partial weight to the state agency consultants' narrative conclusions which are generally consistent with Dr. Oberlander's testimony, to which the ALJ gave significant weight.[2] Hence, the ALJ's RFC determination adequately accounted for Meghan's mental impairments and more than a mere scintilla of evidence supports her mental RFC finding.

Dallas points to his own testimony regarding his limitations to argue that he is not capable of sustaining work activities on a regular and full-time basis. Doc. 17 at 11. Dallas testified that he can barely accomplish daily tasks, his apartment is a mess, he rarely does laundry or showers, he stays home almost all the time, he has no friends, he has difficulty with focus and concentration,

---

[2]     Dallas does not challenge the weight the ALJ assigned to the state agency consultants' opinions.

his medications made him feel like a "zombie," and therapy made him feel worse. (R. 22, 28-29). Dallas claims this testimony demonstrates that he "certainly would not be capable of doing any [work] on a sustained basis, five days a week, eight hours a day." Doc. 17 at 11. But the ALJ did not ignore the testimony to which Dallas now points. The ALJ acknowledged Dallas's testimony that he has difficulty leaving his home as well as Dallas's allegations that he has problems completing tasks and with concentration. (R. 90). The ALJ also discussed and considered Dallas's subjective statements regarding medication side effects and the effectiveness of medication and therapy. *Id*. at 92-93. As discussed in greater detail below, the ALJ adequately explained and supported his evaluation of Dallas's subjective complaints. *See infra* at 9-16.

Moreover, Dallas has not shown how his testimony supports his claim that he would be unable to maintain full-time employment with the restrictions included in the RFC. In fact, the state agency psychological consultants, Melanie Nichols and Steven Fritz, Psy.D., specifically considered Dallas's allegations that he cannot get up in the morning, skips bathing, has to force himself to do any personal care, and does not attend to laundry or housework regularly because of his mental impairments but found him capable of performing full-time work. (R. 55, 57, 60-61, 70, 72, 76). The ALJ gave partial weight to the opinions of the state agency psychological consultants' narrative mental RFC assessments. *Id*. at 61, 76, 93. But the ALJ found that Dallas was slightly more limited in his ability to interact with others and adapt or manage himself than Dr. Friz's opinion indicated. *Id*. at 93. Furthermore, Dr. Oberlander, who reviewed the treatment notes and heard Dallas's testimony at the hearing, opined that he could sustain full-time work with the particular non-exertional functional limitations reflected in the RFC. Based on this evidence, it was reasonable for the ALJ to conclude that despite his mental impairments, Dallas was capable of performing work on a full-time and sustained basis given the limitations included in the RFC.

7

In the end, Dallas essentially argues that the ALJ should have weighed the objective medical evidence and his subjective complaints differently, but it is not this Court's role to reweigh the evidence or substitute its judgment for that of the ALJ. *Burmester*, 920 F.3d at 511.

In any event, the Seventh Circuit has held that even if an ALJ's RFC assessment of CCP restrictions is somehow flawed, any error is harmless where the claimant fails to identify additional limitations supported by the record that the ALJ should have included in the RFC. *Morrison v. Saul*, 806 F. App'x 469, 474 (7th Cir. 2020); *Jozefyk v. Berryhill*, 923 F.3d 492, 498 (7th Cir. 2019) (any mental RFC assessment flaw was harmless because it was "unclear what kinds of work restrictions might address [claimant's] limitations in concentration, persistence, or pace because he hypothesizes none" and "the medical does not support any."); *Saunders v. Saul*, 777 F. App'x 821, 825 (7th Cir. 2019) (upholding RFC where claimant suggested no "better way to capture the idea behind limitations in concentration, persistence, and pace and apply those problems to job requirements"). Dallas does not identify any specific additional limitations supported by the record that the ALJ should have included in the RFC to account for his moderate CPP limitations. Along with the fact that Dallas failed to explain what further restrictions should have been imposed to account for his CPP limitations, the medical record contains no doctor's opinion relating to mental functioning more restrictive than the RFC. That is significant because the Seventh Circuit has established that "[t]here is no error when there is 'no doctor's opinion contained in the record that indicated greater limitations that those found by the ALJ.'" *Best v. Berryhill*, 730 F. App'x 380, 382 (7th Cir. 2018); *Lockett*, 834 F. App'x at 239 (7th Cir. 2020) (affirming limitations in RFC where "no doctor opined that [claimant] had restrictions beyond those the ALJ found."). Thus, the Court finds that the ALJ's mental RFC finding in this case adequately accounts for his moderate CPP restrictions and is supported by more than a mere scintilla of evidence.

B.      **Dallas's Subjective Symptom Allegations**

Dallas next argues that the ALJ improperly discounted his subjective symptom allegations. "An ALJ's findings concerning the intensity, persistence, and limiting effect of claimant's symptoms must be explained sufficiently and supported by substantial evidence." *Ray v. Saul*, --- F. App'x ----, 2021 WL 2710377, at *4 (7th Cir. 2021). In evaluating a claimant's subjective symptoms, "an ALJ may consider several factors, including objective medical evidence and any inconsistencies between the allegations and the record." *Zoch v. Saul*, 981 F.3d 597, 601 (7th Cir. 2020); 20 C.F.R. § 416.929(c). The Court will not reverse an ALJ's subjective symptom conclusions unless they are "patently wrong, meaning they lack any explanation or support." *Anders v. Saul*, --- F. App'x ----, 2021 WL 2396236, at *4 (7th Cir. 2021) (internal quotes omitted); *Ray*, 2021 WL 2710377, at *4 ("Patently wrong is a high threshold.").

The ALJ found that the record as a whole, including the medical record and Dallas's degree of adherence to treatment, failed to support that his functioning was as limited by his mental impairments as he alleged. (R. 90-91). The ALJ provided several legitimate reasons for discounting Dallas's subjective symptom allegations, including the objective medical evidence, the effectiveness of treatment, the degree of adherence to treatment, medication side effects, his daily activities, and his statements to his treaters and case manager. *Id*. at 91-93; 20 C.F.R. § 416.929(c); SSR 16-3p, 2017 WL 5180304, at *5-8 (Oct. 25, 2017).

None of Dallas's objections with respect to the ALJ's subjective symptom evaluation show that the ALJ's assessment was patently wrong. Dallas first claims that the ALJ revealed a "startling misunderstanding of mental illness" by "searching for objective evidence" which supported Dallas's allegations of disabling mental symptoms then criticizes her for "[i]gnoring many objective facts and focusing largely upon an ability to remain out of the hospital to undermine [his]

symptoms." Doc. 17 at 12. Contrary to Dallas's argument, the ALJ did not improperly engage in "an all-too-common misunderstanding of mental illness" by relying on single or isolated reports of a "good day" to conclude that claimant's bipolar disorder was stable enough to allow him to work. *Scott v. Astrue,* 647 F.3d 734, 740 (7th Cir. 2011). Rather, the ALJ explained why Dallas's subjective complaints concerning his mental impairments were not support by objective evidence. The ALJ noted that for the "year and half" following Dallas's May and July 2016 hospitalizations, treatment notes reflected largely unremarkable mental status examinations. (R. 91-92) (citing *id.* at 366-67, 518-19, 570-71, 575-76, 581-82, 587-88, 593-94, 669). Additionally, the ALJ did not err by acknowledging the "inherently subjective nature of mental diagnoses" but yet determining that the objective findings by his psychiatrists failed to support the severity of his alleged symptoms. The ALJ was entitled to rely on the psychiatrists' objective evidence in evaluating Dallas's subjective symptom allegations. 20 C.F.R. § 416.929(c)(2); SSR 16-3p, 2017 WL 5180304, at *5 ("minimal or negative findings or inconsistencies in the objective medical evidence is one of the many factors we must consider" in evaluating a claimant's symptoms).

Relatedly, Dallas claims the ALJ's summary of his largely unremarkable psychiatric examinations following his hospitalizations "reveals a good deal of impermissible cherry picking" because he still continued to be "disheveled, depressed, anxious, and incapable of handling more than the most basic activities of life." (Doc. 17 at 13). "An ALJ has the obligation to consider all relevant medical evidence and cannot simply cherry-pick facts supporting a finding of non-disability while ignoring evidence that points to a disability finding." *Denton v. Astrue,* 596 F.3d 419, 425 (7th Cir. 2010). In this case, the ALJ did not present an inaccurate picture of Dallas's mental state following his hospitalizations. For example, the ALJ noted that despite examination findings of cooperative behavior with good eye contact, normal speech and thought process, intact

memory, and good insight and judgment, Dallas also "reported a lack of motivation and energy, negative thoughts, sleep disturbance, and isolation." (R. 91). The ALJ also noted that Dallas "described feeling anxious often, including about leaving the house and going to doctor's appointments." *Id*; *see also id*. (noting reports of irritability, significant depression, and fatigue); *id* (noting expression of "doubt in his ability to attend therapy sessions due to fatigue and apathy."); *id*. (noting report to case manager of "a lack of motivation to leave the house and do things."). In light of these references, the Court does not find that the ALJ engaged in impermissible cherry-picking of Dallas's symptoms.

The ALJ found that Dallas's subjective symptom statements conflicted with the objective medical evidence showing improvement and stabilization in Dallas's mental health condition after his discharge from hospitalization in July 2016. (R. 91-92). The ALJ's conclusion in this regard is supported by the record. While it is true, as Dallas points out, that improvement in symptoms does not in and of itself indicate an ability to sustain full-time work, *Murphy v. Colvin*, 759 F.3d 811, 819 (7th Cir. 2014), the ALJ did not improperly equate improvement of Dallas's mental condition with an ability to work full time. Instead, the ALJ cited evidence of Dallas's improved mental condition as evidence that undercut his own subjective testimony that his symptoms were disabling. She appropriately determined that the objective evidence of improvement suggested that Dallas was not as limited as he claimed. *Jones v. Astrue*, 623 F.3d 1155, 1161 (7th Cir. 2010) ("discrepancies between the objective evidence and self-reports may suggest symptom exaggeration."). As a result, the ALJ did not err in considering the objective evidence of improvement in addition to the other evidence in the record when assessing Dallas's subjective allegations.

In addition to considering the objective findings, the ALJ appropriately considered the effectiveness of treatment in evaluating the nature and severity of Dallas's subjective symptoms. 20 C.F.R. § 416.929(c)(3)(iv), (v); *see also* SSR 16-3p, 2017 WL 5180304, at *8 (ALJ should consider effectiveness of medication and treatment other than medication). The ALJ found that Dallas's testimony that treatment for his mental impairments had been unsuccessful was not entirely consistent with the medical record. (R. 92). The ALJ noted that when Dallas restarted Risperdal in May 2017, he reported improved mood, energy, and motivation, including a return to the gym and less anxiety about leaving the house and going into public places. (R. 92, 631, 667-71); *see also id.* at 580 (6/16/2017: while on Risperdal, reported mood and racing thoughts were a little better, he was able to go to the grocery store and make it to his doctor's appointments, and he was not having "weird thoughts anymore."). The ALJ further noted that Dallas only attended four individual therapy sessions with Andrea Stein, L.C.S.W., despite his psychiatrist's indication that "non-pharmacologic aspects of depression treatment need to be addressed more vigorously." *Id.* at 92, 569. The ALJ next noted that while Dallas's testified that therapy did not "work" for him, the record showed that he attended only four sessions out of 24 approved sessions. *Id.* at 92, 665. As the ALJ pointed out, at his last therapy session in June 2017, Dallas expressed frustration that he was "not getting anything" out of the sessions, but he later retracted the statement and said he had already benefitted from the sessions. *Id.* at 92, 661. At that time, Ms. Stein wrote that Dallas's "level of functioning [was] reasonably expected to be maintained, if not improved, as a result of these interventions." *Id.* at 662. The ALJ noted that in November 2017 and after starting Latuda, Dallas's primary care provider noted no depression, anxiety, or agitation in his physical exam and wrote Dallas felt stable on his psychiatric medications. *Id.* at 92, 677.

In evaluating Dallas's subjective symptoms, the ALJ also properly considered Dallas's noncompliance with treatment recommendations, such as attending only four therapy sessions and not taking prescribed medication. *See* 16-3p, 2017 WL 5180304, at *9 ("if the individual fails to follow prescribed treatment that might improve symptoms, we may find the alleged intensity and persistence of an individual's symptoms are inconsistent with the overall record."); *Imse v. Berryhill*, 752 Fed. App'x. 358, 362 (7th Cir. 2018) ("The ALJ reasonably considered the impact of Imse's noncompliance []; Imse declined two doctors' recommendations for physical therapy, and when she finally did seek treatment, she failed to follow through."). Dallas testified that his medications made him feel like a "zombie" and therapy made him feel worse. (R. 22-23). "The side effects of medication can significantly affect an individual's ability to work and therefore should figure in the disability determination process." *Flores v. Massanari*, 19 F. App'x 393, 399 (7th Cir. 2001).[3]

The ALJ considered Dallas's claim that he stopped taking his medication because of intolerable side effects and therapy did not work for him, but she was not required to accept Dallas's explanation for failing to pursue treatment. (R. 92-93); *Morrison*, 806 F. App'x at 474. The ALJ pointed out that Dallas's claim that he stopped taking medication because of adverse side

---

[3]     Dallas cites *Voigt v. Colvin*, 781 F.3d 871, 876 (7th Cir. 2014), to suggest that the ALJ misunderstood mental illness because the ALJ considered Dallas's noncompliance with medication and therapy. The *Voigt* court held a lack of psychiatric hospitalization is not evidence that a claimant is capable of full-time work. *Voigt*, 781 F.3d at 876 ("The institutionalization of the mentally ill is generally reserved for persons who are suicidal, otherwise violent, demented, or (for whatever reason) incapable of taking even elementary care of themselves."). Dallas makes no effort to explain how the issue in *Voigt* relates to this case, and his citation to the *Voigt* decision is unpersuasive. Here, the ALJ did not rely on the absence of psychiatric hospitalization as evidence that Dallas was capable of full-time employment. The ALJ appropriately found that Dallas's mental condition improved because that the treatment records after his discharge from the July 2016 hospitalization "do not show any subsequent return to the mental state he experienced during the hospitalizations." (R. 91).

effects was not entirely consistent with his own statements elsewhere in the medical record that he had stopped taking his medications because: he did not feel they were helpful; he ran out of them; and due to stress and lack of sleep caused by a noisy neighbor. *Id*. at 92, 574, 626. Moreover, at times, Dallas denied any medication side effects *Id*. at 340 (7/13/2016: "denied side effects from medications"); *id*. at 365 (10/19/2016: "Side effects: none"); *id*. at 517 (12/5/2016: "Side effects: none"). The ALJ also noted that while Dallas alleged side effects from Risperdal, Dallas also acknowledged that he did not take it regularly and could try it again at some point. *Id*. at 92, 581, 593-94. While the ALJ did not specifically mention Dallas's alleged "zombification," the ALJ did not overlook evidence relating to Dallas's claims of medication side effects. *Lothridge v. Saul*, 984 F.3d 1227, 1234 (7th Cir. 2021). Moreover, the record shows the only medication that Dallas described to his physicians as making him feel "zombified" was Seroquel, which he was prescribed for less than a month and which he stopped taking in May 2017. *Id*. at 574, 581, 586-87, 589, 594-95, 631; *see also id*. at 27-28. Further, the ALJ credited Dr. Oberlander's testimony which explicitly discussed and considered Dallas's report of feeling "zombified" and nevertheless determined that Dallas was capable of performing work with certain non-exertional restrictions. *Id*. at 42-43, 94. Accordingly, the ALJ properly considered and rejected Dallas's allegations of intolerable medication side effects.

Dallas next challenges the ALJ's reliance on his daily activities, specifically his ability to travel to Kentucky for over a month to visit family. Daily activities are a relevant factor for an ALJ to consider in a symptom evaluation. 20 C.F.R. § 416.929(c)(3)(i); *Jeske v. Saul*, 955 F.3d 583, 592 (7th Cir. 2020) ("In fact, agency regulations instruct that, in an assessment of a claimant's symptoms, the evidence considered includes descriptions of daily-living activities."); *Alvarado v. Colvin*, 836 F.3d 744, 750 (7th Cir. 2016) ("[I]t is entirely permissible to examine all of the

evidence, including a claimant's daily activities, to assess whether 'testimony about the effects of his impairments was credible or exaggerated.'").  Thus, the ALJ considered Dallas's reported ability to prepare simple meals, grocery shop, go to a coffee shop, and use public transportation alone in a major metropolitan area. (R. 87-88).  Dallas argues that the ALJ's consideration of his trip to Kentucky to visit his family as evidence that suggested "he was functioning on a high level" was misleading because he traveled to Kentucky "in a desperate effort to seek calm and relief from his pervasive symptoms" and there is no evidence his sporadic trips helped in the long term. Doc. 17 at 14.  The ALJ did not conclude that Dallas's Kentucky trip suggested a high level of functioning but rather, considered this evidence in assessing his testimony that treatment was not effective.  In finding that Dallas's allegation that his treatment was not effective was not entirely consistent with the record, the ALJ explained that Dallas reported Risperdal improved his mood, energy, motivation, anxiety, racing thoughts, and fatigue, and then he was able to return to the gym, had led less anxiety about leaving the house and going places, and traveled to Kentucky for over a month to visit family. *Id*. at 92.  The ALJ's reasoning with respect to Dallas's trip to Kentucky supports her discounting his testimony about the effectiveness of his treatment. *Ortega v. Berryhill*, 2018 WL 4144636, at *5 (N.D. Ill. 2018) ("it was permissible for the ALJ to generally consider how Plaintiff's ability to travel would undermine his credibility.").  Thus, the ALJ did not err in considering Dallas's trip to Kentucky as further reason to doubt that Dallas's treatment was ineffective in improving his symptoms.

Finally, Dallas argues that the ALJ erred in her consideration of the objective medical evidence by failing to mention two PHQ-9 screenings that indicated severe symptoms of major depression on October 18, 2016 and February 24, 2017. (R. 512, 703).  "The PHQ-9 is a questionnaire used to assist a clinician in diagnosing depression, as well as to quantify depression

symptoms and monitor severity." *Pugh v. Saul*, 2021 WL 3116285, at *5 n.2 (N.D. Ind. June 11, 2021). The ALJ could have expressly referred to Dallas's PHQ-9 scores in her evaluation of Dallas's subjective symptom complaints but no reversible error occurred because the Seventh Circuit has made clear that an "ALJ need not address every piece of evidence." *Lothridge*, 984 F.3d at 1234; *Arana v. Colvin*, 2015 WL 4506848, at *7 (N.D. Ill. July 14, 2015) ("Plaintiff cites no controlling authority that the ALJ must consider PHQ-9 scores."). The PHQ-9 scores rate the severity of Dallas's subjective reports of his depression symptoms, which the ALJ was not required to accept. (R. 378, 409, 413, 420, 444); *Charmaine R. v. Saul*, 2021 WL 83737, at *6 (N.D. Ill. Jan. 11, 2021); *Lim v. Saul*, 2020 WL 2557000, at *8 (N.D. Cal. May 20, 2020) ("[T]he PHQ-9 questionnaire reflects [the claimant's] reported self-assessment."). In not expressly mentioning the PHQ-9 scores, the ALJ did not ignore an entire line of evidence favorable to Dallas, such that the subjective symptom analysis was flawed. *Deborah M. v. Saul*, 994 F.3d 785, 788 (7th Cir. 2021) (ALJ "prohibited only from ignoring an entire line of evidence that supports a finding of disability."). On the record presented, the Court is satisfied that the ALJ was aware of and considered the extent of Dallas's reported severe symptoms of major depression, which is sufficient. The ALJ's cited the two treatment records containing the PHQ-9 scores, showing that she considered evidence of Dallas's severe symptoms of major depression. Doc. 17 at 14; (R. 91) (*citing id*. at 511, 700); *Candice A. Z. v. Kijakazi*, 2021 WL 3187783, at *4 (N.D. Ill. July 28, 2021). Furthermore, Dr. Oberlander, whose opinion the ALJ adopted, as well as the state agency physician on reconsideration, expressly considered the PHQ-9 scores and nevertheless did not accept Dallas's allegations of disabling symptoms. (R. 43-44, 76).

16

C. **Opinion Evidence**

Dallas last argues that the ALJ erred in giving "significant" weight to the opinion of the testifying medical expert Dr. Oberlander and only "little" weight to the opinion of Daniel Wood, his treating nurse practitioner. The Court finds no error in the ALJ's evaluations of these opinions.

Dallas argues that the opinion of Daniel Wood was entitled to greater deference. As a nurse practitioner ("NP"), Wood is not an "acceptable medical source" under the regulations governing claims filed prior to March 27, 2017. 20 C.F.R. §§ 416.902(a)(7), 416.927(a)(1)-(2); SSR 06-3p, 2006 WL 2329939, at *1 (Aug. 9, 2006). NP Wood's opinion is therefore not entitled to consideration as a "medical opinion" or as a "treating source" opinion. *Anders*, 2021 WL 2396236, at *3. However, an ALJ may still consider evidence from other sources, such as therapists, social workers, nurse practitioners, or physician assistants, if their "special knowledge of the individual" allows them to "provide insight into the severity of the impairment(s) and how it affects the individual's ability to function." SSR 06-3p, 2006 WL 2329939, at *2. Opinions from "medical sources who are not acceptable medical sources" are considered using the same factors as list in 20 C.F.R. § 416.927(c) for "medical opinions," although "not every factor for weighing opinion evidence will apply in every case." 20 C.F.R. § 416.927(f)(1). The ALJ was required to minimally articulate her reasons for rejecting Wood's opinion. 20 C.F.R. § 416.927(f)(2); *Sosh v. Saul*, 818 F. App'x 542, 547 (7th Cir. July 14, 2020).

Prior to Wood providing his opinion on October 2, 2018, Dallas saw Wood four times, on February 24, 2017, May 1, 2017, October 16, 2017, and November 16, 2017. (R. 675-89, 697-703). On October 2, 2018, Wood completed a Physical Residual Function Capacity Statement indicating that Dallas: experiences stress severe enough to constantly interfere with attention and concentration needed to perform even simple work tasks; needs to take unscheduled breaks which would require him being away from the work area ¾ of an 8-hour workday; would be off task due

to his mental limitations 15% of a workday; and would be absent from work because of his mental impairments five or more days per month. *Id*. at 711-14. Wood opined that Dallas would be unable to obtain and retain full-time work in a competitive environment because of his mental limitations. *Id*. at 714. Wood diagnosed "Bipolar I Disorder Current Episode depressed [with] psychotic features." *Id*. at 711. The symptoms Wood listed were fatigue, depression, and lack of ambition. *Id*. Wood identified the most significant clinical findings and objective signs that supported his assessment as: displays lack of engagement with care full time and bipolar diagnosis affects his ability to engage with activities of daily living. *Id*.

The ALJ assigned little weight to NP Wood's opinions.[4] The ALJ gave several valid reasons supported by record evidence for discounting Wood's opinions regarding Dallas's mental impairments, including that they were not adequately supported by his own treatment notes, Dallas's treatment history, and other evidence in the record. First, the ALJ found that Wood's own treatment records failed to support his opinions. For example, the ALJ pointed out that Wood's most recent examination of Dallas on November 16, 2017 found no depression, anxiety or agitation and noted that Dallas felt stable on his psychiatric medications. (R. 94-95, 677). The ALJ also pointed out Dallas's sparse treatment history with Wood—only four times between February and November 2017—which treatment focused primarily on Dallas's physical issues and deferred Dallas's psychiatric treatment to his psychiatrist. *Id*. at 94, 675, 680, 684, 697; *see also id*. at 701 (2/24/2017: "Pt. to follow up with Psych within next month"); *id*. at 688 (5/1/2017: "Continue engagement of care with psych" and "Advised to discuss with psych about medication."); *id*. at 682 (10/16/2017: "Seeing external psych [at] Heartland"); *id*. at 678 (11/16/2017: "Seeing external

---

[4] Because Dallas does not challenge the ALJ's physical RFC assessment, the Court does not address the ALJ's evaluation of NP Wood's opinion regarding his exertional limitations and instead focuses on his opinion regarding Dallas's non-exertional limitations.

psych"). Given this record, it is clear that the ALJ properly considered the length, nature, and extent of the treatment relationship, and the Court rejects Dallas's claim that the ALJ did not acknowledge his "long treatment relationship" with Wood. Doc. 17 at 15. Further, in discounting Wood's opinion regarding Dallas's mental limitations, the ALJ found the opinions inconsistent with the largely unremarkable mental status examinations from Dallas's psychiatrists. *Id*. at 91, 92, 95, 366-67, 518-19, 570-71, 575-76, 581-82, 587-88, 593-94, 669. These are legitimate reasons under the application regulation for rejecting a nurse practitioner's opinion. 20 C.F.R. 416.927(c), f(1). The Court finds that the ALJ's assignment of little weight to NP Wood's opinions is supported by more than a mere scintilla of evidence.

Dallas next contends that the ALJ erred in her review of Dr. Oberlander's opinion. The ALJ gave testifying medical expert Dr. Oberlander's opinion significant weight. (R. 94). After reviewing the medical record and hearing Dallas' testimony, clinical psychologist Dr. Oberlander, Ph.D., found that Dallas has a mild limitation in the area of understanding, remembering, or applying information and a moderate limitation in the areas of interacting with others, concentrating, persisting, or maintaining pace, and adapting or managing oneself. *Id*. at 40-41. Dr. Oberlander opined that with appropriate psychiatric and psychosocial treatment, including both pharmacological agents as well as counseling and psychotherapy, Dallas retains the ability to perform simple, routine, repetitive work activities in a low stress work setting in which there are no strict hourly production rates, but could meet end of day production expectations with only occasional contact with coworkers, supervisors, and the public. *Id*. at 41.

"An ALJ may have a medical expert assist with interpreting the record evidence" and must consider "the factors the regulations identify for assessing medical opinions." *Plessinger v. Berryhill*, 900 F.3d 909, 914 (7th Cir. 2018). The ALJ gave two sufficient reasons why she

credited Dr. Oberlander's opinion. First, the ALJ noted that Dr. Oberlander's testimony was supported by references to the medical record, including the notes of Dallas's case manager Benjamin Walker.[5] (R. 94). For example, as pointed out by Dr. Oberlander, although Dallas still reported ongoing depression and lack of motivation in April 2017, Walker noted that Dallas's mood, affect, and cognition were all within normal range and he engaged well in dialogue. *Id*. at 39, 631). Dr. Oberlander explained that he found Walker's notes to be consistent over time. *Id*. at 40. For instance, in October 2017, Dallas told his case manager that he was "doing okay," he did not have concerns about his ability to manage his depression and anxiety, including his ability to adhere to medications and set and attend appointments, and he did not need ongoing case management. *Id*. at 625-26. Dr. Oberlander also testified that he considered the opinion of Dr. Fritz, the state agency psychologist on reconsideration. *Id*. at 40.

Second, the ALJ found Dr. Oberlander's findings consistent with the record as a whole. (R. 94). For example, the ALJ noted that Harlow reported improved mood, energy, and motivation after beginning Risperdal in May 2017, and that after starting Latuda in October 2017, Harlow's primary care provider noted no depression, anxiety, or agitation and that Harlow felt stable on his medications. *Id*. at 92, 669, 671, 677. The ALJ also pointed out that treatment records did not show a return to the poor mental state he experienced during his hospitalizations. *Id*. at 91. She noted that over the subsequent year and a half, psychiatrists regularly observed Harlow as appropriate, candid, cooperative, and polite, with non-pressured speech, logical and lucid thought processes, intact memory, and good insight and judgment. *Id*. at 91-92, 366-67, 518-19, 570-71, 575-76, 581-82, 587-88, 593-94, 669. And the ALJ noted that in November 2017, Dallas told his

---

[5] Walker worked with Dallas between February 24, 2017 and November 16, 2017. (R. 546-52, 675-89, 711).

primary care provider he felt stable on his medication, and did not seek any subsequent psychiatric care. *Id*. at 92, 625, 677. In accepting Dr. Oberlander's medical opinion, the ALJ properly evaluated the extent to which it was supported by other evidence and consistent with the record as a whole. 20 C.F.R. § 416.927(c)(3)-(4). Accordingly, the ALJ properly addressed the supportability and consistency of Dr. Oberlander's opinion.

Dallas does not dispute the ALJ's finding that Dr. Oberlander's opinion was supported by references to the record and was consistent with the overall record. Instead, Dallas's only argument is that the ALJ inadequately evaluated Dr. Oberlander's opinion by not discussing two favorable portions of his testimony. First, Dallas argues that the ALJ ignored Dr. Oberlander's testimony regarding the PHQ-9 scores in the record, which Dr. Oberlander stated indicated periods of serious depression and variability of symptoms. (R. 43). Dr. Oberlander testified that he was unable to correlate the variability of Dallas's symptoms with times when he was off his medications. (R. 43-44). From this, Dallas concludes that the ALJ failed to account for the variable nature of his mental health symptoms on his ability to maintain regular attendance and stay on task at work. The Court disagrees and finds that the ALJ adequately accounted for the variably in Dallas's reported symptoms. The ALJ's decision explicitly noted that Dallas reported variable mental-health symptoms. *Id*. at 91-92. The ALJ considered that subsequent to Dallas's May and July 2016 hospitalizations, Dallas "reported a lack of motivation and energy, negative thoughts, sleep disturbance, and isolation." *Id*. at 91; *see also id*. (noting "described feeling anxious often, including about leaving the house and going to doctor's appointments.); *id*. (noting reports of irritability, significant depression, and fatigue); *id* (noting expression of "doubt in his ability to attend therapy sessions dues to fatigue and apathy."); *id*. (noting report of "a lack of motivation to leave the house and do things."). However, the ALJ also noted periods of reported improvement

symptoms. *Id*. at 92 (noting report of "improved mood, energy, and motivation, including a return to the gym and less anxiety about leaving the house and going into public places."); *id*. (noting report of "feeling very confident in his ability to manage his anxiety going forward."); *id*. (noting report that "his anxiety was better" and "his racing thoughts were better."); *id*. (noting "he also said his fatigue was better.").

Moreover, the ALJ reasonably accepted Dr. Oberlander's opinion which expressly considered the impact of Dallas's variable symptoms, including the PHQ-9 scores, in his assessing Dallas's functional limitations. (R. 43-44). Despite some variable symptoms throughout the relevant period, Dr. Oberlander opined that Dallas retained the RFC to perform simple, routine, repetitive work activities in an environment with no strict hourly production rates with only occasional interaction with coworker, supervisors, and the general public. And the ALJ credited every limitation Dr. Oberlander identified. Dr. Oberlander did not testify that the variability of Dallas's mental health symptoms merited another functional limitation. Moreover, because Dallas was represented by counsel at the hearing, he is "presumed to have made his best case before the ALJ." *Matthews*, 833 F. App'x at 436. Dallas's attorney could have questioned Dr. Oberlander further about whether the variability of Dallas's symptoms merited any additional limitations. *Id*. The "ALJ could have asked the expert herself, but it is [Dallas's] burden, not the ALJ's to prove that he is disabled." *Id*.

Second, Dallas argues that the ALJ ignored Dr. Oberlander's acknowledgement that Dallas described medication side effects, including testifying that medications "zombified" him, which Dallas contends could have further impeded his functioning. (R. 22). Dallas's counsel questioned Dr. Oberlander as to whether Dallas's statements that he tried a variety of medications but they caused side effects would affect his ability to work a full-time job. *Id*. at 42-43. Dr. Oberlander

22

recognized that the record shows Dallas reported medication side effects but he did not opine that medication side effects would make Dallas incapable of full-time simple, routine, repetitive work with other restrictions. *Id*. at 42-43. As discussed above, the ALJ was aware of and considered the claimed medication side effects and articulated the extent to which she discredited Dallas's testimony in that regard. (R. 92, 94). Further, the ALJ adopted Dr. Oberlander's testimony which considered Dallas's report of feeling "zombified" but found he was capable of performing work with certain non-exertional restrictions. *Id*. at 42-43, 94. Thus, the ALJ supported her evaluation of the record, including her evaluation of Dr. Oberlander's opinion, with more than a mere scintilla of evidence.

## **CONCLUSION**

For the reasons stated above, Plaintiff's request for reversal or remand [17] is denied, the Acting Commissioner's Motion for Summary Judgment [22] is granted, and the ALJ's decision is affirmed. The Clerk is directed to enter judgment in favor of the Acting Commissioner and against Plaintiff.

**SO ORDERED.**

Dated: October 7, 2021

Sunil R. Harjani
United States Magistrate Judge